NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0540n.06

**No. 14-5446**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 30, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| **CURTIS DANIEL HART,** | ) | |
| | ) | |
| Petitioner-Appellant, | ) | **ON APPEAL FROM THE** |
| | ) | **UNITED STATES DISTRICT** |
| v. | ) | **COURT FOR THE WESTERN** |
| | ) | **DISTRICT OF TENNESSEE** |
| **HENRY STEWARD, WARDEN,** | ) | |
| | ) | **OPINION** |
| Respondent-Appellee. | ) | |

_____/

**Before:  SUHRHEINRICH and GRIFFIN, Circuit Judges; STAFFORD, District Judge.**[*]

**STAFFORD, District Judge.**  Petitioner Curtis Daniel Hart appeals the district court's denial of habeas relief from his Tennessee convictions for second degree murder, simple possession of Alprazolam, and simple possession of marijuana.  He was sentenced to a total of thirty-five years of imprisonment.  Although the district court denied a certificate of appealability as to all eleven claims raised in Hart's habeas petition, this Court granted a certificate of appealability with respect to two issues: (1) whether counsel was ineffective for failing to challenge the introduction into evidence of statements that Hart allegedly made after his arrest but before he was *Mirandized*; and (2) whether counsel was ineffective for failing to request alleged exculpatory evidence of a knife that had been

_____

[*]The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

either withheld from the defense or unpreserved. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. For the reasons that follow, we **AFFIRM** the district court's judgment.

**I.**

The facts underlying Hart's conviction were set forth by the Tennessee Court of Criminal Appeals in its opinion on direct appeal. *State v. Hart*, No. W2006 01332 CCA R3 CD, 2007 WL 2284815, at *1 3 (Tenn. Crim. App. Aug. 9, 2007). Those facts are presumed to be correct on habeas review. 28 U.S.C. § 2254(e)(1). In relevant part, the facts as outlined by the state appellate court are as follows:

On the morning of August 8, 2005, Barry Crane was found with two gunshot wounds in the back of his head at his home in Tipton County, Tennessee. Crane's body was discovered by his next door neighbor, Marvin Fletcher. In response to a call from Fletcher, Tipton County Sheriff's deputies began routinely interviewing all of the neighbors in the immediate area. One of the first persons to be interviewed was Hart, who lived across the street with Adam and Rachel Thomas and their two children. Hart told the deputies that he had visited with Crane the previous day but had left him early in the evening. *Id.* at *1.

Some time after he was interviewed by the deputies, while the officers were still at the scene, Hart summoned a deputy into the Thomas's yard and showed the deputy an "SKS" assault rifle that Hart said he found near the Thomas's mailbox. An earlier inventory of Crane's house by Crane's son had revealed that a .9mm semi-automatic pistol and a "SKS" Chinese assault rifle were missing. At the request of deputies, Hart went to the Sheriff's Department where he gave a written statement to an investigator stating, among other things: "I want to make sure that everyone knows that I did

not kill Crane. I had nothing to do with him dying." Hart admitted, however, that he sold Crane twenty Xanax pills for $90.00 the afternoon of August 7. *Id.*

Later that evening, Hart confessed to the Thomases that he shot Crane. He explained to the Thomases that Crane had been drinking, began going through the house gathering guns, threatened Hart with a knife, and in fact cut Hart above his eyebrow. Rachel Thomas recalled that Hart said "it happened so fast that he just shot him, because he got cut and he felt threatened." *Id.*

The next day, August 9, Hart contacted his former employer, Greg Moore, and showed him an abrasion on his forehead. Hart said to Moore: "That's where a guy held a knife to me, and I popped him twice in the chest." Moore then called the Tennessee Bureau of Investigation ("TBI") and reported that Hart said he had killed his neighbor and might harm himself. *Id.* at *2.

In response to Moore's call, TBI Special Agent Donna Turner drove to Crane's neighborhood and walked to the end of Hart's driveway. Seeing the agent, Hart came out of the house to talk with her. At some point during their conversation, Hart was searched. A plastic bag containing some plant material (identified by Hart as marijuana) and an unmarked pill bottle containing some pills (identified by Hart as Xanax) were recovered from Hart's person. Hart was thereafter transported to the Tipton County Sheriff's Department, where at 2:24 p.m., he reviewed a written waiver-of-rights form. Agent Turner read each of the constitutional rights to Hart, including his right to remain silent, and advised him that he was waiving those rights. Hart signed the waiver-of-rights form and, at 2:30 p.m., signed a form acknowledging that he understood that his statement was being given under oath and was the truth. He thereafter gave a detailed oral statement to Agent Turner. *Id.* at *5.

Hart began his oral statement by saying:

> I want to do the right thing and get this straight. I shot and killed Barry Crane. I want to take responsibility for my actions. It is the right thing to do. I was lead [sic] by the Lord to tell the truth on what happened.

He continued by giving details about what happened in Crane's house the night of the murder.

Among other things, Hart explained that he killed Crane in self-defense. In his words:

> . . . . Barry kind of hemmed me up against the table and pulled a knife out of his back pocket. It looked like it was a butterfly knife. Barry stuck it to my forehead and told me he could cut my face off.
>
> Barry's belly had me pinned against the table. I took my arms and swept Barry's arms to get the knife away from my head. The knife came out of his hands. I don't know where it landed.
>
> I reached and got the pistol off the kitchen table. I picked it up with my right hand, and I shot him. Barry staggered a few feet, and I shot him again.
>
> . . . .
>
> . . . . When Barry stuck that knife to my head, he scared me. I reacted the only way I knew to survive.
>
> When I got to my house, I went in and had the pistol in my shorts pocket. . . .

Hart ended his oral statement by saying: "I have freely given this statement to Agent Turner. It is the truth." Once transcribed, Hart's statement produced six, single-spaced, typed pages. He read each paragraph of the transcribed statement, placing his initials at the beginning and end of each paragraph. At 8:14 p.m. on August 9, Hart signed an affidavit stating that the statement he gave was true. *Id.*

On November 7, 2005, a Tipton County grand jury returned a three-count indictment charging Hart with (1) second-degree murder; (2) possession of Alprazolam, a Schedule IV

controlled substance, with intent to deliver; and (3) simple possession of marijuana. Before trial, Hart filed a motion to suppress the statement he made to Agent Turner on August 9, 2005. He contended that his statement to Agent Turner was obtained in violation of his rights under the Fifth Amendment to the United States Constitution because he was under the influence of a narcotic Xanax at the time the statement was given. His motion to suppress was denied by the state trial court, and at trial his statement was read to the jury by Agent Turner. Hart elected not to testify but relied on his August 9 statement to support his argument that he shot Crane in self-defense. The jury rejected Hart's argument and found him guilty of second-degree murder, simple possession of Alprazolam, and simple possession marijuana. Hart was sentenced to thirty-five years as a multiple-offender. *Id.* at *3.

## II.

In a § 2254 habeas proceeding, we review the district court's legal conclusions de novo, applying the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Moore v. Berghuis*, 700 F.3d 882, 886 (6th Cir. 2012). Under the AEDPA, a federal court may not grant a habeas petition for "any claim that was adjudicated on the merits in State court proceedings" unless the state proceedings (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To obtain habeas relief from a federal court, a petitioner must show that the state court's ruling on a claim "was so lacking in justification that there was an error well understood and comprehended

in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

To establish ineffective assistance of trial counsel, Hart must show that (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 88 (1984). To establish deficient performance, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. A court considering counsel's performance "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. To establish prejudice under *Strickland*, a petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

In *Harrington*, the Court explained the juxtaposition of the standards under *Strickland* and § 2254(d) as follows:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When

> § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington,* 562 U.S. at 105 (citations omitted).

## III.

Hart first claims that his trial counsel was ineffective because he failed to challenge the introduction of statements made by Hart to investigators in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Without any record citation, Hart states in his brief before this court:

> Agent Turner admitted she did not *Mirandize* Mr. Hart [at the house] "because I did not have the form." Despite this, she began questioning Mr. Hart designed to elicit incriminating answers. She wanted Mr. Hart to confess. While Mr. Hart was being transported to the police station, still without being advised of his rights, additional questioning took place. Upon arrival at the police station, Mr. Hart was still being questioned for nearly 10 additional minutes before finally receiving his *Miranda* warnings at 2:24 p.m.

Hart raised the same ineffective-assistance-of-counsel claim in a post-conviction motion filed in state court. In that motion, Hart asserted that he was questioned without being *Mirandized* both in the driveway at his house and in the car while he was being transported to the Sheriff's Department. He maintained that this initial questioning "poisoned" his later *Mirandized* statement and that his trial counsel was ineffective for failing to challenge the admission of *all* statements that he made to law enforcement.

Hart relied on Agent Turner's testimony at the preliminary hearing to support his assertion that he was questioned without being *Mirandized* before he was taken to the Sheriff's Department. In particular, Hart pointed to Turner's testimony that, when she began talking with Hart at the end of his driveway, she told him that she realized what he had done, knew that he possibly had the

weapon, and did not want him to hurt himself or anyone else. According to Turner, Hart responded to her comment by saying that he did not have the weapon on him, that he had thrown it in a garbage can at a nearby Circle K, and that he would show the officers where he had disposed of the gun. Hart did not mention in his motion that Turner also expressly testified at the preliminary hearing that her comment to Hart and his response thereto occurred "initially, at the scene before he was arrested."[1] He also did not mention that Turner's testimony included an express denial that Hart was questioned at any time before he was *Mirandized* at the Sheriff's Department.

The state post-conviction court rejected Hart's *Miranda*-based ineffective-assistance-of-counsel claim after hearing the testimony of both Hart and his trial counsel. The court determined that *Miranda* warnings were not required before Hart volunteered statements to Agent Turner regarding the gun and its disposal. According to the judge: "There was no reason to *Mirandize* [Hart] at this point, as he was not in custody."[2] The trial judge also found no basis for suppression of the detailed statement that Hart gave to officers at the Sheriff's Department because Hart was appropriately *Mirandized* before the interview began. Having found no basis for suppression of any of the statements made by Hart to law enforcement, the trial court determined that Hart failed to show that his trial counsel was deficient in declining to file a *Miranda*-based motion to suppress. The Tennessee Court of Criminal Appeals affirmed, in essence finding that Hart failed to show either

---

[1] Agent Turner also testified at trial that Hart was searched, handcuffed, and placed in a transport vehicle at some point after Hart told her that he disposed of the weapon at a nearby Circle K in response to her comment that she "knew what had happened" and "just did not want him to hurt himself or one of us or anyone else."

[2] Hart's trial counsel testified at the post-conviction hearing that Hart's statement regarding the disposal of the gun was made both voluntarily and before Hart was in custody.

deficient performance or prejudice based on his counsel's failure to file "a motion that would have been without merit." *Hart v. State*, No. W2008 02715 CCA R3 PC, 2010 WL 962939, at *7 (Tenn. Crim. App. Mar. 18, 2010).

On federal habeas review, applying AEDPA standards, the district court rejected Hart's *Miranda*-based ineffective-assistance-of-counsel claim, finding no reason to overturn the decision of the Tennessee appellate court. Upon de novo review of the record, we likewise find that Hart is not entitled to federal habeas relief based on *Miranda*.

The procedural safeguards set forth in *Miranda* apply to suspects who are subject to "custodial interrogation," defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *see also Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) (explaining that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"). "An accurate statement made by an officer to an individual in custody concerning the nature of the charges to be brought against the individual cannot reasonably be expected to elicit an incriminating response." *United States v. Collins*, 683 F.3d 697, 703 (6th Cir. 2012); *see also United States v. Payne*, 954 F.2d 199, 202 (4th Cir. 1992) ("[T]he *Innis* definition of interrogation is not so broad as to capture within *Miranda's* reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges."). "Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478.

In this case, Hart first made incriminating statements regarding the murder weapon and its disposal when Agent Turner  standing near her vehicle that was parked at the end of Hart's driveway  said to Hart that she realized what had happened, knew that he possibly had the weapon, and "just did not want him to hurt himself or one of us or anyone else." Turner testified, both at the preliminary hearing and at trial, that Hart's response  that he had disposed of the weapon at a nearby Circle K  was made *before* he was arrested, searched, handcuffed, and placed in a vehicle for transport to the Sheriff's Department. The state courts credited Turner's testimony, did not credit Hart's post-conviction testimony to the contrary, and consequently found  as a fact  that Hart's disposal-of-the-weapon comments were made when he was *not* in custody. We find no basis for concluding that the state court's determination of that fact was unreasonable.

Not only do we accept the state court's finding that Hart was not in custody when he responded to Agent Turner's comments at his residence, we find that his response was not the product of "interrogation." Rather, it was a voluntary response to an officer's accurate declaratory statement. *See Raedeke v. Trombley*, No. 08  1407, 2009 WL 751096, at *5 (6th Cir. Mar. 23, 2009) (holding that a defendant's response to an officer's comment, "you are under arrest, you know what you are under arrest for," was admissible because the officer's comment "was an affirmative statement not intended to elicit a response"); *United States v. Hurst*, 228 F.3d 751, 760 (6th Cir. 2000) (holding that "the mere statement by [a law-enforcement official] that 'we've got good information on you,' viewed in context, contains no compulsive element suggesting a Fifth Amendment violation"); *United States v. Murphy*, 107 F.3d 1199, 1205 (6th Cir. 1997) (holding that defendant's pre-*Miranda* incriminating statements  made in response to an officer's advising him

that "things would be easier for him if he talked" were admissible because they were voluntary and not the product of interrogation). Because Hart was neither in custody nor subjected to interrogation, Turner was not required to *Mirandize* Hart before she told him that she realized what had happened, knew that he possibly had the weapon, and "just did not want him to hurt himself or one of us or anyone else."

Furthermore, the public-safety exception to *Miranda* as articulated in *New York v. Quarles*, 467 U.S. 649 (1984) applied to Turner's pre-*Miranda* comments about the weapon. In *Quarles*, the Supreme Court explained that when officers ask "questions necessary to secure their own safety or the safety of the public" as opposed to "questions designed solely to elicit testimonial evidence from a suspect," they do not need to first provide *Miranda* warnings. *Id.* at 659. In *United States v. Williams*, 483 F.3d 425 (6th Cir. 2007), this Court held that *Quarles* requires an officer to "have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *Id.* at 428. Here, when Turner said to Hart that she realized he possibly had the weapon, she knew that (1) Hart had admitted to his former employer a day earlier that he shot Crane and might use the weapon to kill himself; (2) Hart lived with two small children who, in fact, were playing in the yard when Turner arrived at Hart's residence to talk with him; and (3) Hart had led officers the day before to a location in his yard where Crane's missing SKS assault rifle was found. Turner clearly had reason to believe that Hart "might have (or recently have had) a weapon, and . . . that someone other than police might gain access to that weapon and inflict harm with it." Hart's un-*Mirandized* response to Turner's statement about the weapon was admissible under *Quarles*.

In his brief before this court, Hart asserts that he was improperly questioned both at the police station before he was *Mirandized* and also while he was being transported from his residence to the police station. Hart has not revealed, however, what, if any, questions were asked of him during his brief ride to the police station or immediately after he arrived at the station. Although Hart made the same assertions in his motion for post-conviction relief, the Tennessee courts did not expressly address these assertions, instead finding that Hart was properly advised of his *Miranda* rights before *any* "custodial interrogation" took place. The record supports this finding. During the preliminary hearing, Agent Turner testified that, at the police station, Hart was not asked any questions and did not provide any information about the crime until after he was *Mirandized*. Agent Turner's notes confirm that from 2:10 p.m when Hart arrived at the police station until 2:24 when he signed the waiver-of-rights form, Hart was asked for nothing more than routine background information (date of birth, parents' names, college major, medical condition, medications). Agent Turner also testified at the preliminary hearing that, other than pointing out which trash can at the Circle K he used to dispose of the .9mm weapon, something Hart had earlier volunteered to do, Hart was not questioned about the crime during the ride to the police station. Hart's testimony to the contrary was not credited by the Tennessee courts.

Having found no violation of *Miranda*, the Tennessee state courts appropriately applied *Strickland's* deferential standard and determined that Hart did not show that his trial counsel was ineffective for failing to challenge the introduction into evidence of Hart's incriminatory statements. Noting that trial counsel himself testified that a *Miranda*-based motion to suppress "would have been

without merit,"[3] the Tennessee Court of Criminal Appeals found that Hart failed to establish either the deficient performance or the prejudice prong of the *Strickland* standard. Here, where judicial scrutiny of an ineffective-assistance-of-counsel claim is doubly deferential, we are satisfied that the Tennessee courts' rejection of Hart's *Miranda*-based ineffective-assistance-of-counsel claim was not the result of an unreasonable application of federal law or an unreasonable determination of the facts. Hart is not entitled to habeas relief on this claim.

## IV.

The day after Crane was shot and killed, Hart confessed to his housemates, Adam and Rachel Thomas, and to his former employer, Greg Moore, that he twice shot Crane in self-defense after Crane threatened and slashed him with a knife. All three of those individuals testified to that effect at trial. They also testified that, when Hart confessed to them, they saw a wound (cut or abrasion) on Hart's forehead that was consistent with Hart's story. The day after he confessed to Moore and the Thomases, Hart confessed to the police, again explaining that he shot Crane in self-defense after Crane threatened him with what Hart described as a butterfly knife.

At trial, the jurors were shown a police videotape and photograph of the crime scene, both of which showed a knife on the floor of the living room next to Crane's body. The jurors also saw a photograph of Hart that showed a cut above one of his eyebrows. The jury did not see the knife

---

[3]The reasoning behind trial counsel's decision not to file a motion to suppress was revealed by Hart himself at the post-conviction hearing:

> I brought [the motion to suppress] up to [trial counsel], and he . . . [explained]  they needed to get me away from the residence because there were children there and they thought that I was armed, so they had taken me to the back of a police car. But at that time they didn't have to *Mirandize* me because I wasn't in custody.

itself. Michael Turberville of the TBI testified at trial that he thought the knife, which he identified from the photograph as a "buck knife," was not recovered. Agent Turner testified at the preliminary hearing that neither she nor the crime scene team collected the knife.

Hart's trial counsel admitted at the post-conviction hearing that he did not specifically ask the prosecutor to produce the knife.[4] Counsel explained that he did not request production of the knife because he realized, from Agent Turner's testimony at the preliminary hearing, that neither she nor the crime scene team had collected the knife. Counsel also explained that he was concerned that Hart's description of the knife a "butterfly knife" was inconsistent with the knife ("more like a pocketknife") depicted in the crime scene photograph and video.

As he does in his federal petition for habeas corpus relief, Hart claimed in his state-court motion for post-conviction relief that his trial counsel was ineffective because he failed to ask the State to produce exculpatory materials, the knife in particular. This claim was rejected by the state courts, the Tennessee Court of Criminal Appeals explaining as follows:

> [T]he petitioner argues that counsel was ineffective for failing to ask for exculpatory materials. During the post-conviction hearing, the petitioner failed to introduce any evidence that counsel did not request these materials. Trial counsel testified that he did not specifically request a knife that was shown on a videotape of the crime scene because he did not believe the State had possession of it. Further, the petitioner failed to demonstrate that the State actually had possession of the knife. The petitioner has not demonstrated ineffective assistance on the part of trial counsel for failing to request a piece of evidence that counsel did not believe was in the State's possession. The petitioner also failed to demonstrate that counsel did not request all potential exculpatory materials.

*Hart v. State*, 2010 WL 962939 at *7. The district court likewise found Hart's knife-based

---

[4]Counsel was not asked and did not say whether he filed a routine motion for exculpatory evidence.

ineffective-assistance-of-counsel claim to be without merit. We reach the same conclusion.

In his brief before this court, Hart asserts that "trial counsel's unreasonable failure to demand production of the knife, knowing it existed based on the video, resulted in material prejudice to Mr. Hart, whose self-defense claim rested upon the existence of the knife." He makes no reasoned argument, however, to support his assertion that, under *Strickland*, his counsel's failure to explicitly request production of the knife resulted in prejudice to Hart. Indeed, Hart's assertion is belied by the record evidence that *was* available for trial    namely, a photograph of the crime scene showing a knife next to Crane's body, a video to the same effect, three witnesses who testified that they saw a wound on Hart's forehead as Hart was telling them that he shot Crane when Crane threatened him with a knife, a photograph of the wound on Hart's forehead as it appeared when Hart was taken into custody the next day, and Hart's own lengthy *Mirandized* confession describing how Crane hemmed him against the kitchen table, pulled a knife out of his back pocket, and placed it against Hart's forehead, causing Hart to pick up one of Crane's guns and shoot. The knife, had it been available, would have been merely cumulative of other evidence.

In *Harrington*, the Supreme Court explained that "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105. Here, counsel testified that he did not request production of the knife because he did not believe the State had possession of the knife. Given counsel's deliberate and informed decision to eschew making what he thought would be a futile request, and given that other evidence was available to establish the existence of the knife and its relation to Hart's self-defense claim, there *is* a "reasonable

argument that counsel satisfied *Strickland's* deferential standard," dooming Hart's knife-related ineffective-assistance-of-counsel claim.

**V.**

Because we find that the district court properly denied Hart's petition for writ of habeas corpus, we **AFFIRM.**